IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| VICTOR GOZION, JR., | ) | CASE NO. 1:08 CV 2320 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | MAGISTRATE JUDGE McHARGH |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | **MEMORANDUM OPINION** |
| Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to Local Rule. The issue before the undersigned is whether the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Victor Gozion, Jr.'s application for Disability Insurance Benefits under Title II of the Act, 42 U.S.C. §§ 416(i), 423 is supported by substantial evidence and, therefore, conclusive.

For the reasons set forth below, the Court AFFIRMS the decision of the Commissioner.

## I. PROCEDURAL HISTORY

Plaintiff filed his current application for Disability Insurance Benefits on September 7, 2002, alleging that he had been disabled since October 21, 2002 due to bilateral carpal tunnel syndrome and bursitis in the right shoulder (Tr. 20, 93-95, 107, 307, 430). The State Agency denied Plaintiff's application initially and upon reconsideration (Tr. 67-68, 73-80).

On January 4, 2005, Plaintiff appeared at a hearing before ALJ Benjamin Cero (Tr. 409-26). ALJ Cero continued the hearing to enable Plaintiff's counsel to obtain additional medical records and to allow Plaintiff to undergo a consultative psychological examination.

Plaintiff subsequently appeared and testified at a hearing before ALJ Jeffrey Hatfield (Tr. 382-408). ALJ Hatfield determined in a decision dated January 11, 2006 that Plaintiff was not disabled (Tr. 280-93). On January 17, 2006 Plaintiff requested review of ALJ Hatfield's decision from the Appeals Council. On May 4, 2007 the Appeals Council granted the request for review, vacated ALJ Hatfield's decision, and remanded the case for further proceedings (Tr. 294-98).

Pursuant to the Appeals Council's order, Plaintiff appeared and testified at a third hearing before ALJ Peter Beekman on September 26, 2007 (Tr. 427-59). Danial Schweid, M.D., a Medical Expert ("ME"), and Deborah Lee, a Vocational Expert ("VE") also testified at the hearing (Tr. 302, 306). ALJ Beekman ("the ALJ") determined in a decision dated October 24, 2007 that Plaintiff was not disabled (Tr. 20-30). Plaintiff again sought review from the Appeals Council, which denied Plaintiff's request, thereby rendering the ALJ's decision the final decision of the Commissioner (Tr. 8-11).

## II. EVIDENCE

### A. Personal and Vocational Evidence

Born on May 9, 1955 – age 52 at the time of the ALJ's determination – Plaintiff is an "individual closely approaching advanced age." See 20 C.F.R. §§404.1563, 416.963. Plaintiff graduated from high school and completed at least one year of college (Tr. 431). He has past relevant work as a commercial artist and photographer (Tr. 29, 108, 123-30).

2

### B. Medical Evidence

### 1. Physical Impairments

Plaintiff was treated at Kaiser-Permanente Medical Center on March 3, 1998 for right shoulder and elbow discomfort. He was diagnosed with right shoulder impingement syndrome (Tr. 194-95). Plaintiff was later diagnosed with right shoulder epicondylitis (Tr. 192). Plaintiff underwent a series of injections to the right shoulder and elbow, after which Plaintiff reported partial relief (Tr. 190).

On August 31, 2001, Plaintiff underwent an electromyelogram and nerve conduction velocity test. The test disclosed "mildly severe" right carpal tunnel syndrome and "early" left carpal tunnel syndrome (Tr. 202).

Dr. Mehdi Saghafi, M.D. conducted a consultative examination of Plaintiff on March 13, 2002. He noted Plaintiff's complaints of numbness in both hands and pain in the right postolateral elbow (Tr. 203). Plaintiff's wrists and hands were essentially normal on examination, and Dr. Saghafi opined that Plaintiff could perform heavy work (Tr. 203-04).

On November 25, 2002 Plaintiff was examined by Dr. She Que Huang, M.D. Dr. Huang noted a limited range of motion in Plaintiff's right shoulder, evidence of joint abnormality, and that all rotator cuff provocating tests were positive (Tr. 246-47). He further noted that Plaintiff had a negative Tinel's sign and a positive Phalen's test and carpal compression tests bilaterally (Tr. 247). Dr. Huang opined that Plaintiff was employable, except in jobs requiring a high degree of dexterity or repetitive motion (Id.).

A State Agency Physical Residual Functional Capacity Assessment completed on December 12, 2002 concluded that Plaintiff was unable to lift more than 20 pounds occasionally

and 10 pounds frequently (Tr. 254). The assessment further indicated that Plaintiff would be limited in the use of his right hand for reaching, handling and fingering (Tr. 256).

Plaintiff visited Kaiser multiple times throughout 2003 and 2004 for treatment for his arm and shoulder difficulties. Plaintiff was prescribed wrist splints at night, and he later noted that wearing the wrist splints made the numbness and tingling in his hands bearable (Tr. 267, 344).

A physical examination completed on December 30, 2004 at Northeast Ohio Neighborhood Health center revealed decreased sensation in Plaintiff's first through third fingers bilaterally (Tr. 380).

Radiographs of Plaintiff's shoulders taken on February 1, 2005 at Kaiser revealed mild degenerative changes of the acromioclavicular joint and glenohumeral joint in Plaintiff's right shoulder and resorption of the distal end of the left clavicle in Plaintiff's left shoulder (Tr. 336).

### 2. Mental Impairments

On October 21, 2002 Plaintiff saw Dr. Catherine Wilde, Ph.D. at Kaiser Permanente for depression. Plaintiff reported a loss of interest in most activities, that he was sleeping a lot, and that he had no energy (Tr. 218). Dr. Wilde diagnosed Plaintiff with major depressive disorder and chronic pain syndrome in right arm due to carpal tunnel syndrome, bursitis, and tendonitis (Tr. 219). She assigned Plaintiff with a GAF of 51 and noted that Plaintiff needed aggressive treatment for his depression (Tr. 220). Dr. Wilde also referred Plaintiff to a psychiatrist for medication (Id.).

On November 21, 2002 Dr. Kadle, a State Agency psychologist, reviewed Plaintiff's records and opined that Plaintiff was moderately limited in only a few functional areas and that Plaintiff could perform simple to multi-step tasks (Tr. 240-45).

On March 19, 2003, Dr. Shila Mathew, M.D. completed an assessment for the Bureau of Disability Determination in which she acknowledged that she had seen Plaintiff once in November 2002 and that she did not know how he had been doing since then (Tr. 261-63). The assessment does not describe any functional limitations.

On April 24, 2003, Plaintiff saw Dr. Mathew at Kaiser Permanente for treatment for depression (Tr. 265). Dr. Mathew noted that Plaintiff "continued to feel depressed about his situation," was "very reclusive these days" and had "no enjoyment in anything," but that he had "no thoughts of suicide" (Id.). Plaintiff's appearance was adequate; his eye contact was good; his thought processes were coherent, logical, and goal directed; his insight was good; and his judgment was intact (Tr. 266). Dr. Mathew discontinued Plaintiff's Effexor prescription and substituted Wellbutrin (Tr. 265-66).

On January 17, 2005, Dr. Mathew completed a Medical Source Statement regarding Plaintiff's mental capacity (Tr. 278-79). In this statement, Dr. Mathew opined that Plaintiff's abilities to do the following functional activities would be "poor to none:" maintain regular attendance and punctual within customary tolerances; deal with the public; relate to co-workers; interact with supervisors; deal with work stresses; complete a normal workday and work week without interruptions from psychologically based symptoms and perform at a consistent pace without and unreasonable number of rest periods; socialize; and behave in an emotionally stable manner (Id.). She further stated that "the above information is based on his emotional status and

5

not on his medical problem. I understand that his medical problem is the main disabling factor" (Tr. 279).

After the hearing before ALJ Cero, on March 31, 2005, Plaintiff underwent a psychological consultative examination conducted by Dr. Chandler Mohan (Tr. 318-321). Dr. Mohan noted that Plaintiff appeared well-kept and that he was cooperative but sad and tearful during the interview (Tr. 320). He noted that Plaintiff had gone to the emergency room – but was not admitted – in July 2004 because he purposely cut himself (Tr. 319). Dr. Mohan diagnosed Plaintiff with major depressive disorder and chronic pain syndrome in Plaintiff's right arm due to carpal tunnel syndrome, bursitis and tendonitis and assigned Plaintiff with a GAF of 50 (Tr. 320). He recommended that Plaintiff continue on Lexapro, that he join a pain management group and that he get involved with psychotherapy sessions (Id.). He felt that Plaintiff was "not suitable for profitable employment" at the present time (Tr. 321).

### C. Hearing Testimony

Plaintiff testified that he had numbness in three fingers on his left hand (Tr. 433). He also indicated that he had difficulty carrying a grocery bag and that he often dropped things (Tr. 435). He stated that his treatment for depression had helped to the extent that he was no longer cutting himself or having suicidal thoughts, but that he was still socially withdrawn and had a difficult time being in public and dealing with people (Tr. 437-39).[1]

---

[1] Plaintiff testified at the second hearing that he often had fits of rage and thoughts of suicide, and he brought pictures to the hearing showing cuts that he had made to his wrists (Tr. 393-403). Plaintiff further testified that he once had deliberately driven his car into a guardrail (Tr. 403).

6

The ME testified that Plaintiff's right-shoulder bursitis, right-rotator-cuff tendonitis, right-lateral epicondylitis, and bilateral carpal tunnel syndrome all constituted severe impairments (Tr. 442). He also noted that Plaintiff's depression was a severe impairment (Id.). The ME opined that Plaintiff's ability to lift and carry with his right arm would be limited, but that he could lift and carry 20 pounds occasionally and 10 pounds frequently, primarily with his left arm and shoulder (Tr. 445). He further opined that Plaintiff would be restricted from repetitive overhead reaching and repetitive movements with his right arm and hand; from rapid, repetitive movements of his left hand and fingers; and from dextrous movements and fine, discriminatory sensation with either hand, but more so on the right (Id.). He also indicated that Plaintiff should be restricted from work involving high stress or production quotas, arbitration, negotiation and/or confrontation (Tr. 446). The ME further stated that Plaintiff should not be in a supervisory role or a role involving responsibility for the health, safety, or welfare of others (Id.).

The VE testified that a hypothetical person with certain functional limitations would not be able to perform Plaintiff's past relevant work as a commercial artist, but that there were other jobs existing in significant numbers in the national economy that the person could perform, namely: museum attendant, furniture-rental clerk, and tanning salon attendant (Tr. 456-57).

### III. DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance Benefits only when he establishes disability within the meaning of the Social Security Act. *See* 42 U.S.C. §§ 423. A claimant is considered disabled when he cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or

that has lasted or can be expected to last for a continuous period of not less than twelve (12) months." *See* 20. C.F.R. § 404.1505.

### IV. **STANDARD OF REVIEW**

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards. *See Cunningham v. Apfel*, 12 Fed. Appx. 361, 362 (6th Cir. June 15, 2001); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence. *See Kirk v. Secretary of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.* The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).

This Court may not try this case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner*, 745 F.2d at 387. However, it may examine all evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Secretary of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

8

## V. ANALYSIS

A. **Whether the ALJ Erred by Failing to Give Appropriate Weight to the Opinions of Plaintiff's Treating Physician**

Plaintiff argues that the ALJ failed to give appropriate weight to the January 2005 opinion of his treating physician, Dr. Mathew, and that the ALJ failed to give good reasons for rejecting that opinion. The Court addresses each of these arguments in turn. First, Plaintiff characterizes Dr. Mathew as a treating physician whose opinion should be entitled to great or controlling weight under the Social Security regulations. Defendant questions the validity of this characterization, as the evidence appears to demonstrate that Dr. Mathew only saw Plaintiff on two occasions.

A treating physician is "your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, *an ongoing treatment relationship* with you." 20 C.F.R. § 404.1502 (emphasis added). "A physician qualifies as a treating source if the claimant sees [him] 'with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition.'" *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540 (6th Cir. 2007); *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6 th Cir. 2007) (quoting 20 C.F.R. § 404.1502). In *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed.Appx. 496, 507 (6th Cir. 2006), a panel of the Sixth Circuit held that, as a matter of law, a doctor who examines a claimant only once does not qualify as a "treating physician." In *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007), the Sixth Circuit held that two doctors – one of whom examined the claimant only once and wrote a single "physical capacity evaluation," and the other of whom "examined [the claimant], completed a medical report, prescribed and refilled back pain medication, and

9

denied additional medication when Smith returned seeking more" – were not "treating physicians" for purposes of the treating physician rule. In <u>Boucher v. Apfel, 238 F.3d 419 (Table), 2000 WL 1769520 at *9 (6th Cir. Nov. 15, 2000)</u>, the court noted that a doctor who examined the claimant on three occasions did not have the ongoing treatment relationship with the claimant necessary to qualify him as a treating source.

The evidence in this case seems to reflect that Plaintiff saw Dr. Mathew, a psychiatrist at Kaiser Permanente, a total of two times for his depression – once on November 12, 2002 and once again on April 24, 2003.[2] *See* tr. 261-63, 265-66, 278-79. In between the first and second visits, on March 19, 2003, Dr. Mathew completed a questionnaire for the state agency in which she indicated that Plaintiff had no impairments. (Tr. 261-63). During the second visit, Dr. Mathew noted that Plaintiff "continued to feel depressed about his situation," was "very reclusive these days" and had "no enjoyment in anything," but that he had "no thoughts of suicide" (Tr. 265). Dr. Mathew's notes also indicated that Plaintiff's appearance was adequate; his eye contact was good; his thought processes were coherent, logical, and goal directed; his insight was good; and his judgment was intact (Tr. 266). Following the second visit, on January 17, 2005, Dr. Mathew completed an assessment in which she opined that Plaintiff's abilities in a number of functional areas were "poor to none."

Given that Dr. Mathew saw Plaintiff only twice over a period of more than two years, the Court is somewhat unconvinced that Dr. Mathew should qualify as a treating physician for

---

[2]No documentation from the alleged November 2002 visit appears in the record, but Dr. Mathew references this visit in her March 19, 2003 questionnaire. (Tr. 261-63). In that questionnaire, the date "11/12/2002" appears in a space next to the label "Date first seen." (Tr. 261). Dr. Mathew also writes in the questionnaire: "[s]een only once," and "[s]aw him once. Meds prescribed. Do not know how he is doing." (Tr. 261-62).

purposes of the treating physician rule. It seems unlikely that two visits over a two-year time period would represent "a frequency consistent with accepted medical practice for" the treatment of depression. *See* 20 C.F.R. § 404.1502. However, even if Dr. Mathew qualifies as a treating physician for purposes of the rule – a proposition the Court seriously questions – the Court finds that the ALJ did not err with respect to his treatment of Dr. Mathew's opinion.

The opinions of a treating physician generally are entitled to "substantial, if not controlling deference." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). But this level of deference is appropriate only where the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007). An ALJ is not bound by the opinion of a treating physician. If the treating physician's conclusions are based, in large part, on a plaintiff's subjective complaints, an ALJ's decision to disregard the doctor's opinion is proper. *See Young v. Secretary of Health & Human Servs.* 925 F.2d 146, 151 (6th Cir. 1990). However, if an ALJ rejects the opinion of a treating physician, he must clearly articulate "good reasons" for doing so. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").

Plaintiff claims that the ALJ rejected Dr. Mathew's opinion in this case based on a misreading of the chronology of the record. Defendant counters that "the ALJ's rejection of Dr. Mathew's January 2005 opinion had nothing to do with a misreading of the chronology of the

record but with the lack of documentary medical evidence to support the dramatic change in Dr. Mathew's opinion from March 2003 to that offered in January 2005" (Doc. 15, at 13 n.10).

Contrary to Plaintiff's assertion, the Court does not believe that the ALJ necessarily rejected Dr. Mathew's opinion based on a misreading of the chronology of the record. The ALJ stated that he was rejecting Dr. Mathew's opinions because he found them to be "internally inconsistent" and because Dr. Mathew provided no elaboration as to the reasons for her 2005 shift in opinion "except to state that it was based on his emotional status and not a 'medical problem.'" (Tr. 28). Although Plaintiff is correct that the ALJ does not mention Dr. Mathew's 2003 evaluation, it does not necessarily follow that the ALJ was ignoring or unaware of the existence of that evaluation or that he was mistaken as to when that evaluation took place relative to Dr. Mathew's completion of each assessment. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 507-08 (6th Cir. 2006) (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)) ("[I]t is well-settled that '[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'"). As both Defendant and the ALJ correctly note, Dr. Mathew in fact does not explain why she apparently changed her opinion from March 2003 to January 2005. *See* tr. 261-63, 265-66, 278-79. Although Plaintiff argues that Dr. Mathew submitted her 2005 opinion after finding that Plaintiff's condition had worsened, Dr. Mathew does not so indicate in her 2005 opinion. *See* tr. 278-79. Plaintiff's suggestion that the 2005 shift opinion was based on Dr. Mathew's finding that Plaintiff had deteriorated therefore amounts to little more than mere speculation. Substantial evidence in the record supports the ALJ's assertion that Dr. Mathew does not explain her 2005 shift in opinion and that her opinions are "internally inconsistent."

Based on the above, the Court finds that the ALJ gave "good reasons" for discounting Dr. Mathew's opinion, assuming that Dr. Mathew qualifies as a treating physician for purposes of applying the "treating physician" rule.

**B.    Whether the ALJ Erred by Asking the VE a Confusing Hypothetical Question and by Failing to Ask the VE if Her Testimony Was Consistent with the DOT**

Plaintiff argues that substantial evidence does not support the ALJ's reliance on the VE's testimony at Step 5 because the ALJ's hypothetical to the VE was confusing, and the record makes clear that the VE did not understand or fully consider Plaintiff's left hand limitations in her response to the hypothetical. The exchange between the ALJ and the VE was as follows:

> Q.    Now I'm going to give you two hypotheticals. The second one will be based on the first, so, it'll make than [sic] easier. We're dealing with a right-dominant, 52-year-old male with a high school education. This person has worked in the past as a commercial artist, and this person can lift/carry 20 pounds occasionally, 10 pounds frequently, primarily with the left hand. This person cannot do any right lifting, carrying, handling, or fingering of – let's say, lifting 0 to 10 pounds. Sorry. Can lift/carry 0 to 10 pounds with the right, 20 pounds with the left, and cannot handle or finger. This person cannot reach overhead with the right, and occasionally with the left. This person cannot do any rapid repetitive movements on the right side, and no rapid or repetitive handling and fingering on the left.
>
> A.    Wait a minute. Rapid, repetitive, movements on the right side –
>
> Q.    Right, which are –
>
> A.    – and, and then, what on the left? Rapid, repetitive movements?
>
> Q.    No rapid repetitive handling and fingering.
>
> A.    So, what's the difference? Reaching?
>
> Q.    Reaching, push/pull.
>
> A.    Rapid handle, finger on left. Rapid, repetitive, ok.

13

Q. The person has no bilateral feeling, either hand.

A. Rapid, repetitive movements on the right side; rapid, repetitive handling and fingering.

Q. This person has no fine discrimination sensation bilaterally. This person can use a foot pedal. This person can drive but uses the left hand to do so. Left arm, I should say. This person can perform routine, simple tasks physically, and should not be involved in any occupation involving arbitration, negotiation, or confrontation, high production quotas, piecework; should not be involved in any occupation wherein the supervision of others [sic] nor responsibility for the health or safety of another. That would be it.

A. Okay, Well –

Q. Let me ask you this question first: Can the person with that RFC do the past relevant work of the claimant?

A. No. You have so many things repeating, here. You have no handle finger on the right-hand side; and then, you say, no rapid, repetitive movements. I think no handle/finger would just rule out –

Q. Okay.

A. – fast, repetitive work.

Q. Okay.

A. So no, he is right hand dominant, and his work required frequent reach, handle, finger, and also dexterity.

Q. Okay.

A. Okay.

Q. Would there be any other jobs in significant numbers in the national or regional economy that this person could perform?

A. So, I'm basically looking at left-handed worker, is what we're sort of looking at.

Q. Um-hmm.

14

> A. No rapid, repetitive handling/fingering on the left, can use a foot pedal. Arbitration, piecework (INAUDIBLE). Well, I can offer several.
>
> * * * * * * * *

(Tr. 455-56).

Plaintiff argues that the above exchange reflects that the ALJ has included the following restrictions: no handling or fingering with either hand; "no bilateral feeling, either hand;" and "no fine discrimination sensation bilaterally." (Doc. 12, at 17). Plaintiff further claims that this exchange clearly shows that the VE has misunderstood the ALJ's left-hand restrictions, as the VE continues to indicate that she is only considering a restriction for "rapid, repetitive handling and fingering" on the left. (Id. at 17-18).

Plaintiff's exact complaint with respect to this issue is somewhat difficult to pin-point. As Defendant notes, Plaintiff does not appear to argue that the ALJ's hypothetical misrepresented Plaintiff's abilities and limitations, but rather that the VE did not understand what the ALJ was trying to say and therefore did not provide a proper response. However, the court finds that there is substantial evidence in the record to support the opposite conclusion. First, Plaintiff seems to complain that the VE failed to account for Plaintiff's restriction from handling and fingering with his left hand. Plaintiff also complains that the jobs identified by the VE "are not all clearly ones which would involve no need for handling or fingering with either hand." (Doc. 12, at 18). Plaintiff points to VE's cited position of "furniture rental clerk" as an example of one that presumably would involve such handling and fingering. (Id.). However, the VE repeatedly stated throughout the above exchange that he is considering a hypothetical individual who would be restricted from "rapid, repetitive handling and fingering" with the left hand, and there is substantial evidence in the record to suggest that the ALJ's left hand

15

restriction *was* for "rapid repetitive handling and fingering," not for *all* left hand handling and fingering. For instance, the ALJ's RFC determination does not include a limitation for all left hand handling and fingering, but only the following left hand restriction: "lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently with his left arm." (Tr. 24). Significantly, Plaintiff does not challenge the ALJ's RFC determination in any manner, and substantial evidence in the record supports an RFC determination that does not preclude all left-handed handling and fingering. For example, Plaintiff stated that he is able to drive with his left hand (tr. 435), and Dr. Schweid testified as to Plaintiff's left side restrictions that:

> I think there would be a benefit of the doubt here on the left. No rapid, repetitive movements of his left hand or fingers. And bilaterally, I would say, no requirement for dextrous movements, either hand; certainly, worse on the right. No fine, discriminatory sensation, either hand, but worse on the right.

(Tr. 445). Neither Dr. Schweid's nor Plaintiff's testimony suggests that Plaintiff is precluded from all handling and fingering on the left side.

Second, Plaintiff seems to complain that the VE failed to indicate that she was accounting for the other left hand restrictions enumerated by the ALJ – namely, "no bilateral feeling, either hand," "no fine discrimination sensation bilaterally," and a restriction to lifting "20 pounds with the left." (Doc. 12, at 17). However, the ALJ's RFC finding did not include any restrictions on the left hand for feeling or fine discrimination, or as described above, for handling and fingering, and – again – Plaintiff does not challenge the ALJ's RFC finding. Additionally, as Defendant notes, at least two of the jobs cited by the VE do not specifically require the ability to feel, "fine discrimination bilaterally," or more than occasional handling, fingering, and reaching. *See* Dictionary of Occupational Titles ("DOT"), Job Title 109.367-010

16

(Museum Attendant); Job Title 295.357-018 (Furniture-Rental Consultant). Accordingly, the court is not persuaded by Plaintiff's argument with respect to this issue.

Finally, Plaintiff complains that the ALJ erred by failing to ask the VE whether her testimony was consistent with the DOT. Under SSR 00-4p, an ALJ has an affirmative duty to ask a VE whether the evidence that he or she has provided "conflicts with [the] information provided in the DOT." ALJs also must "obtain a reasonable explanation for . . . apparent conflict[s]" if the VE's testimony "appears to conflict with the DOT." SSR 00-04p.

The Sixth Circuit has not indicated whether an ALJ's failure to comply with the procedural requirement described in SSR 00-04p – i.e., that the ALJ ask the VE whether his or her testimony is consistent with the DOT – in and of itself, mandates remand. In *Lancaster v. Comm'r of Soc. Sec.*, 228 Fed. Appx. 563, 2007 WL 1228667 at *11 (6th Cir. 2007), the court noted that "[c]ourts are divided as to whether the failure to inquire into DOT inconsistencies entitles a Plaintiff to relief" but remanded the case without directly answering this question. However, as noted in *Fleeks v. Comm'r of Soc. Sec.*, 2009 WL 2143768, at *6 (E.D. Mich. Jul. 13, 2009), "there is considerable support for the application of a harmless error rule where the ALJ fails to make the required inquiry regarding the DOT" (citing *Brown v. Barnhart*, 408 F.Supp.2d 28, 35 (D.D.C. 2006) ("[T]here is substantial and persuasive authority that under SSR 00-4p, 'the mere failure to ask such a question cannot by itself require remand.'"); *Hodgson v. Barnhart*, 2004 WL 1529264, at *2 (D.Me. 2004) ("However, the mere failure to ask such a question cannot by itself require remand; such an exercise would be an empty one if the vocational expert's testimony were in fact consistent with the DOT. Only an inconsistency between the testimony and the DOT that affects a plaintiff's claim could reasonably provide the

basis for overturning the commissioner's decision . . . ."); *Jackson v. Barnhart*, 120 Fed.Appx. 904, 906, 2005 WL 23363, at *1 (3d Cir. 2005) ("Where substantial evidence supports the ALJ's opinion and where the failure to solicit the testimony contemplated in SSR 00-4p is harmless, this court will not reverse the ALJ's decision."); *Tisoit v. Barnhart*, 127 Fed.Appx. 572, 575, 2005 WL 751916, at *2 n. 1 ("This Court has not held that mere failure to inquire about the possibility of an inconsistency under SSR 00- 4p mandates reversal.")).

In *Fleeks*, 2009 WL 2143768, at *6, the court held that the plaintiff was not entitled to remand based on the ALJ's mere failure to comply with SSR 00-04p's procedural rule. It stated:

> The present facts support a finding that the ALJ's failure to make the required inquiry or request DOT codes for the jobs cited by the VE amounts to harmless error. Counsel's one page argument that Plaintiff is entitled to remand under SSR 00-4p is unaccompanied by any allegation that the VE's testimony actually conflicted with the DOT. Although Plaintiff was represented by her present counsel at the administrative hearing, the record shows that he did not raise an objection to the VE's findings or the ALJ's failure to ask if the testimony conflicted with the DOT's information.

*Id.*

It appears that the ALJ in this case did not ask the VE whether her testimony was consistent with the DOT. However, the Court finds that the ALJ's mere failure to comply with SSR 00-04p's procedural requirement does not mandate remand in this case. Plaintiff devotes only a small fraction of one page to this issue and does not even directly argue that the Court should remand this case based on the ALJ's failure to comply with SSR 00-04p. Rather, Plaintiff merely states that the failure "should also be noted." (Doc. 12, at 18). Moreover, Plaintiff has not identified any conflict between the VE's testimony and the DOT, and any actual conflict between the two is not at this point readily apparent. The ALJ stated in his written decision that the VE's testimony was consistent with the DOT, (tr. 30), and as Plaintiff notes, the

VE provided DOT numbers to correspond with each of the jobs she cited at the hearing (tr. 456-57). Additionally, and similarly to the plaintiff in *Fleeks*, Plaintiff in this case did not raise any potential "inconsistency" issues at the hearing. *See* tr. 427-59. Based on these facts, any failure on the part of the ALJ to comply with SSR 00-04p amounts to harmless error.

## VI. <u>DECISION</u>

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is supported by substantial evidence. Accordingly, the decision of the Commissioner is AFFIRMED.

<u>s/ Kenneth S. McHargh</u>
Kenneth S. McHargh
United States Magistrate Judge

Date: <u>September 3, 2009.</u>